# The Lake Shore & Michigan Southern Railroad Company v. Mary J. Miller.

*Railroads : Collision with wagon : Negligence of driver.* In an action against a railroad company, for injuries received by the plaintiff, in a collision between a locomotive and the wagon in which plaintiff was riding, negligence on the part of the person owning and driving the team attached to the wagon, affects the right of the plaintiff to recover, equally with her own negligence.

*Plaintiff's negligence.* The plaintiff cannot recover in such action, if her own negligence, directly or proximately, contributed to produce the injury, though the defendant's negligence may also have concurred in producing the result.

*Reasonable care : Situation or condition in life : Charge to the jury.* The reasonable care which the plaintiff, and the driver of the team, under the circumstances of this case are required to exercise, is not limited or affected by their "situation or condition in life ;" neither their station in life nor any personal peculiarity of either of them had any thing to do with the question. And a charge to the jury that they were required to exercise only such care as "persons of their situation or condition in life" would ordinarily exercise under like circumstances, is erroneous.

*Inconsistent instructions to the jury.* A charge to the jury, which, as a whole, is inconsistent, and impossible to be reconciled or understood by the jury, is erroneous on this ground.

*Burden of proof : Negligence of plaintiff.* In such an action the burden of proof is upon the plaintiff, to show that she acted with due care, or that her own negligence did not contribute to the injury, as well as that the defendant was guilty of such negligence ; and a charge to the jury, that "the plaintiff is not bound to prove more than enough to raise a fair presumption of negligence on the part of the defendant, and of resulting injury to herself; and if she does this, she is entitled to recover, unless the defendant produce evidence sufficient to rebut the presumption," is erroneous.

*Evidence : Negligence.* The evidence in this case tended affirmatively to prove actual and gross negligence on the part of the plaintiff, and the person driving the team after which she was riding, which contributed directly to produce the injury complained of.

*Failure to use one's senses to avoid threatened danger, is negligence.* A person about to pass a railroad track, is bound to recognize the danger, and to make use of the sense of hearing as well as of sight—and, if either sense cannot be rendered available, the obligation to use the other is the stronger—to ascertain, before attempting to cross, whether a train is in dangerous proximity ; and if he neglects to do this, but ventures blindly upon the track, without any effort to ascertain whether a train is approaching, it must be at his own risk ; such conduct is, of itself, negligence, and should be so pronounced by the courts as matter of law.

*Absence of mind.* It is no excuse to a plaintiff seeking to recover for injuries received under such circumstances, that he was absent minded, and did not look to see, or stop to hear, the cars.

*Reasonable care : Judicial notice.* Courts are bound judicially to know that no care is not due, or reasonable, care; that when no care whatever has been used in approaching a known or threatened danger, and no effort whatever made to ascertain or avoid it, reasonable care has not been exercised, and the party has been guilty of negligence.

*Judicial knowledge: Laws of nature: Principles of human action: Railroad transportation: Rate of speed: Highway crossings.* The laws of nature and of the human mind, at least such of them as are obvious to the common apprehension of mankind, as well as the more obvious dictates of common sense, and principles of human action—which are assumed as truths, in any process of reasoning, by the mass of sane minds—constitute a part of the law of the land, and courts are bound judicially to know and apply such laws and principles, accordingly; they are bound to recognize the essential differences in the nature and modes of travel and transportation upon railroads, and ordinary highways, both of which are authorized by law; that greater speed in travel and transportation, is one of the objects of authorizing conveyance by rail; that locomotives and heavy trains cannot be suddenly stopped, or turned out of their course, and that the authority given by law to railroads to cross highways, and fixing no limit to their speed, necessarily gives them the preference at the crossings, otherwise their rate of speed must be so reduced, and the regularity of trains so interrupted, as to defeat the very object and purpose of railroad transportation.

*Diligence: When a question of law.* The question of diligence or reasonable care, is generally one of mixed law and fact, and never exclusively one of fact; juries may act upon the question only where there is some evidence tending to prove it; the relevancy of evidence and its tendency to prove diligence, or whether there be any such evidence, is a question of law; where the facts are found or admitted, if they be such that all reasonable men will be likely to draw from them the same inferences, or where there is no evidence tending to prove diligence, the question is one of law.

*Railroads: Wood piles: Obstructing view of track: Highway crossings.* Whether the piling of wood, by a railroad company, by the side of its track, adjacent to a road crossing the track, in such manner as to obscure the view of approaching trains, imposes upon the company the duty of greater care or caution, in running their trains, or making use of extra means of notifying those about to cross, when trains are approaching:—*Quære ?*

*Heard May 15 and 16.        Decided July 10.*

Error to Branch Circuit.

*Warner Wing* and *John B. Niles*, for plaintiff in error.

*E. G. Fuller*, for defendant in error.

·CHRISTIANCY, CH. J.

The defendant in error sued the railroad company in the circuit court for the county of Branch, in an action upon the case, for injuries received by her in a collision between the locomotive of a passenger train and the wagon in which she was riding with one Eldridge, the owner of the team and wagon, who was driving, or undertook to drive,

across the railroad track at the crossing of a highway; claiming that the collision took place and the injury was caused by the negligence of the company. The negligence of the company mainly relied upon, consisted in their having their wood so piled as to obscure the view of the track, and trains coming from the west, from persons approaching the crossing along the highway, and to prevent their hearing the sound of such trains as plainly as they otherwise would; and it was also claimed on the trial, that the bell of the locomotive of this train was not rung on the approach to the crossing. And, though there was some evidence on the part of the plaintiff tending to show this, most of her witnesses merely saying they did not hear or notice the bell, but some of them stating that it was not rung, the evidence on the part of the defendant, was so overwhelming and convincing to the contrary, that the judge, in giving the case to the jury, remarked, that it seemed to him, that, under the evidence, the ringing of the bell could hardly be seriously questioned; but that he left it to the jury, etc. This remark was well warranted, and the evidence was such that, if the specific question had been left to the jury and they had found the bell was not rung, the court should have promptly set aside the verdict.

The train, though from fifteen to thirty-five minutes behind time, was not running at an unusual speed; and there was no evidence to show, nor was it seriously claimed on the trial, that, after the team was, or could be, seen by the engineer, there was any negligence, or failure to use any proper means for checking the train and avoiding the collision; in fact, the evidence plainly and conclusively showed, that no possible diligence could have enabled the engineer to avoid the collision, after seeing the team. So that the only negligence which can be claimed in the mode of running the train, must rest upon the ground that the

company, having obscured the view and deadened the sound of the approaching train, by the mode of piling their wood, were bound for that reason, to run at much less than their usual rate of speed in approaching that crossing, or to keep a flagman there, or use some other extra means to warn people traveling the highway, of the approach of trains from the west. The materiality of this question must depend upon another: whether the plaintiff's own negligence, or that of Eldridge, who was driving the team, contributed to the injury, within the meaning of the generally settled rule upon this subject; for, as she was riding with Eldridge, the owner and driver of the team, any negligence of Eldridge equally affects her rights in this suit, as was properly held by the court.

The law is too well settled by the overwhelming weight of authority, both in England and in the United States, to be now disputed, that, in an action like this, to recover for an injury arising from negligence of the defendant in carrying on their lawful business without wanton or intentional wrong, the plaintiff cannot recover if his own negligence directly or proximately contributed to produce the injury, though the defendant's negligence may also have concurred in producing the result. This rule, it is true, often, and perhaps generally, fails to produce justice; and, upon abstract principles of right and wrong, may be said to be frequently unjust in its operation. Justice might seem to require that each should bear the loss in the proportion they had respectively contributed to the injury. But precisely here lies the difficulty, which is inherent in the nature of the subject, and the infirmity necessarily incident to all human administration of justice,—the impossibility of ascertaining what portion of the injury was produced by the negligence of the one, and what, by that of the other, and in apportioning to each his just share of

LAKE SHORE & MICHIGAN SOUTHERN R. R. CO. *v.* MILLER.

liability. Courts of admiralty, in cases of collision, when the injury has happened from negligence or want of skill on both sides, have adopted from the maritime law, the principle, that the loss shall be sustained equally by both. See *Abbott on Shipping, 229 to 231, and notes.* But, though this may more nearly approximate justice in many cases, it yet fails to apportion the loss according to the degree of negligence in each; and the principle has never been adopted by the common law, which looks upon parties guilty of negligence in such cases as wrong-doers, and, upon the ground, as it would seem, that no man shall take advantage of his own wrong, refuses to enforce contribution among joint wrong-doers, and, in an action against several, will not sever or apportion the damages, though one defendant is more culpable than another. There are, it is true, some recent cases in Illinois which seem to have adopted the principle, that, though the plaintiff has been guilty of *some negligence,* but *slight, in comparison with that of the defendant,* he may still recover.—*St. Louis, Alton & Terre Haute R. R. Co. v. Todd, 36 Ill., 409; Coursen v. Ely, 37 Ill., 338; Chicago & Alton R. R. Co. v. Hogarth, 38 Ill., 370; Chic., B. & Q. R. R. Co. v. Triplett, id., 482.* But they admit that no fixed rule can be laid down, and each case must depend on its own circumstances. Except in so far as these cases can be sustained on the ground presently mentioned, where the defendant's negligence can be treated as the *proximate cause,* this doctrine must be considered a departure from the common law. The result may be in some cases a nearer approximation to justice than the common-law rule. But whether this be so or not, the common-law rule is settled in this state, and most of the other states, and we do not feel at liberty to disturb it.—*Williams v. M. C. R. R. Co., 2 Mich., 259.*

It is true there are some apparent qualifications or

exceptions to this rule (that a party whose negligence has contributed to the injury cannot recover); thus, though the plaintiff is in fault by negligently driving upon the track of a railroad, or not using due diligence to get out of the way, yet, if he be seen by the engineer in time to avoid the injury by reasonable diligence in checking the train, the failure to do so would be treated as the proximate cause of the injury, if, from what the engineer could see, he had good reason to believe the plaintiff could not, or was not likely to, get off in time, or did not seem to be aware of the danger, and was therefore making no effort to avoid it. But if an engineer see a team and carriage, or a man, in the act of crossing the track, far enough ahead of him to have ample time, in the ordinary course of such movements, to get entirely out of the way before the approach of the engine; or if he sees a man walking along upon the track at a considerable distance ahead, and is not aware that he is *deaf* or *insane,* or from some other cause insensible of the danger; or if he sees a team or man approaching a crossing too near the train to get over in time, he has a right to rely upon the laws of nature and the ordinary course of things, and to presume that the man driving the team or walking upon the track, has the use of his senses, and will act upon the principles of common sense and the motive of self preservation common to mankind in general; and that they will, therefore, get out of the way,—that those on the track will get off, and those approaching it will stop, in time to avoid the danger; and he, therefore, has the right to go on, without checking his speed, until he sees that the team or the man is not likely to get out of the way, when it would become his duty to give extra alarm by bell or whistle, and if that is not heeded, then, as a last resort, to check his speed or stop his train, if possible, in time to avoid disaster. If, however, he sees a child of

tender years upon the track, or any person known to him
to be,' or from his appearance giving him good reason to
believe that he is, insane, or badly intoxicated, or otherwise
insensible of danger, or unable to avoid it, he has no right
to presume that he will get out of the way, but should act
upon the belief that he might not, or would not, and he
should therefore take means to stop his train in time. A
more stringent rule than this—a rule that would require
the engineer to check his speed or stop his train, whenever
he sees a team crossing the track or a man walking on it,
far enough ahead to get out of the way in time, until he
can send ahead to inquire why they do not; or which would
require the engineer to know the deafness or blindness, or
acuteness of hearing or sight, or habits of prudence or
recklessness or other personal peculiarities of all those per-
sons he may see approaching, or upon the track, and more
especially of all those who may be approaching a crossing
upon the highway, though not seen,—any such rule, if
enforced, must effectually put an end to all railroads, as a
means of speedy travel or transportation, and reduce the
speed of trains below that of canal-boats forty years ago;
and would effectually defeat the object of the legislature in
authorizing this mode of conveyance. But how are railroad
companies, or their engineers or employes, to know the per-
sonal peculiarities, the infirmities, personal character or
station in life, of the hundreds of persons crossing or
approaching their track? By inspiration or intuition?
And if they do not know, then how and why shall the
company be required to run their road, or regulate their
own conduct, or that of their servants, by such personal
peculiarities of strangers, of which they know nothing?
These questions suggest their own answers; and these con-
siderations sufficiently show, that the court erred in adopt-
ing, as the standard of reasonable care on the part of

Eldridge and the plaintiff, "such care as persons *of their situation or condition in life,* would ordinarily exert under like circumstances," and in charging, that "any greater care than this she was not required to exercise." This charge, besides being erroneous in itself, is in direct conflict, and wholly irreconcilable, with the charges given in answer to the defendant's 4th, 9th, 10th, 11th, 12th, 14th, 15th, 16th, 18th, 20th, 21st, and 22d requests, thus making the charge, as a whole, inconsistent, impossible to be reconciled or understood by the jury, and erroneous on *this* ground. Neither her station in life, nor that of Eldridge, nor any personal peculiarity of either, had any thing to do with the question; and the jury may have been entirely misled by this direction. This, however, though sufficient to reverse the judgment, is not the only, nor the main, question in the case. And, as there is to be a new trial, it is proper to consider the other exceptions, and such questions as are necessarily involved in the state of facts presented by the record. From the rule of law already stated, that a plaintiff in such case cannot recover, if his own negligence contributed to produce the injury, it necessarily results, that it is just as essential to such recovery, that the plaintiff should not have been guilty of any negligence contributing to the injury, as that the defendant should be; and it is insisted, that the burden of proof is equally upon the plaintiff to prove both these facts; not that he must directly prove, by separate or independent evidence, that he was not himself guilty of such negligence, but that it must in some way appear from the facts and circumstances of the transaction given in evidence. This question is fairly raised by that portion of the general charge, which told the jury, "that the plaintiff is not bound to prove more than enough to raise a fair presumption of negligence on the part of the defendant, and of resulting injury to herself. If she does this she is

entitled to recover, unless the defendant produces evidence sufficient to rebut the presumption;" which was properly excepted to by plaintiff in error. Though there is some conflict between the cases upon this question, we think the great weight of authority fully sustains the point raised by the plaintiff in error, that the burden of proof is equally upon the plaintiff, to show that he acted with due care, or that his own negligence did not contribute to the injury, as that the defendant was guilty of such negligence; and we think this should be so held upon principle as well as upon authority; for, until the plaintiff has shown that he acted with due care, the mere proof of defendant's negligence, and of the injury, does not show that the injury was, in a legal sense, produced by this negligence of the defendant. In the present case, for instance, there is a collision between the horses and wagon of the plaintiff, on one side, and the locomotive of the defendant, on the other. Now, as it is settled that an injury resulting from the negligence of both, though in an unequal degree, gives no cause of action to either, and the abstract fact of the collision alone, would turn the scale in favor of neither, neither makes out a cause of action till he shows that he exercised due care, and that the other party did not. The absence of contributory negligence on the part of the plaintiff is, therefore, just as essential an element in the cause of action as the negligence of the defendants, and just as clearly constitutes a necessary part of the plaintiff's case; and until he has shown it, or until it in some way appears from the evidence, he does not make a *prima facie* case. See *Wilson v. Charlestown, 8 Allen, 138, and cases cited; Galena & C. U. R. R. Co. v. Fay, 16 Ill., 558, and cases cited; Evansville & Crawfordsville R. R. Co. v. Hiatt, 17 Ind., 102; Warner v. N. Y. C. R. R. Co., 44 N. Y., 465 to 471; Button v. Hudson R. R. R. Co., 18 N. Y., 248;* and see *Detroit & Milwau-*

*kee R. R. Co. v. Van Steinburg, 17 Mich., 99*, where this doctrine of the burden of proof is recognized. If there was no evidence tending to establish this essential fact in the plaintiff's case, there was nothing upon which the jury could find a verdict against the defendant.

This involves the necessity of examining all the testimony bearing upon this point, as well that given by defendant as that on the part of the plaintiff; and though, in my view, it is quite unimportant whether the defendant was guilty of negligence, until it appears that she was not, yet, the evidence will be better understood by stating the tendency of the evidence of the whole transaction generally. The ringing of the bell and the stopping of the train as soon as possible by the engineer, after seeing the team, has been already stated, and need not be repeated.

1. *As to the locality and nature of the ground.* This was at a place called Branch,—merely a thickly settled neighborhood in the country. There was no railroad station there (though years before there had been), not even a flag-station, and cars did not stop there, except wood trains to take on wood to be carried to stations along the line. The railroad runs nearly east and west. The crossing upon which the accident occurred, is upon a highway running nearly north and south (slightly north of east, and west of south), called the east crossing (there being another, some seventy-six rods further west, and another nearly as far west of that), the ground descending gently to the east, and the railroad having been excavated down, so that its surface is about two and a half feet below the surface as it originally was; the earth being taken away to fill up elsewhere. The descent of the highway into this railroad cutting, and to the railroad, is very gradual and easy, being steepest where it begins to descend (which is some rods south), and about level where it reaches the track. South

of the railroad about three hundred and sixty-five feet (measured at right angles, and about three hundred and ninety-six, measured on the road upon which the accident occurred), is a highway running east and west, parallel with the railroad; and, between the railroad and this highway, and extending westwardly along the railroad some twenty-seven rods, and along the last-named highway, about seventeen rods west from the road leading to the east crossing, was a wood-yard, belonging to, or leased by, one Rose, who was in the habit of purchasing the wood, bringing it there, and selling it to the company. Only the north portion of the yard, however, had any wood upon it. In the corner near the crossing in question, varying from twenty-four and a half to twenty-five and a half feet from the south rail of the railroad track, on the company's right of way, and about four feet from the west line of the highway, was a pile (No. 1) of short, sawed wood belonging to the company, extending east and west one hundred and twenty feet in length, twenty-six feet in width, and, in the middle, twelve feet five inches high; eight feet south of this was another pile (No. 2) of similar wood, of the company (but outside of their right of way), one hundred and five feet long, twenty-five feet wide, and eleven feet eleven inches high; another pile of same length, twenty-two and a half feet wide, but only five feet nine inches high, some one hundred and twenty feet west of pile No. 1. West of these piles, and twenty-eight feet south of the railroad, was another pile (No. 5), twelve and a half feet high. These high piles (Nos. 1, 2, and 5) intercepted the view of persons approaching this crossing from the south, so that, after arriving (on this highway) within one hundred and sixty feet of the crossing, the cars, coming from the west, could not be seen by persons sitting in a wagon, until arriving within twenty-six feet from the south rail at the crossing; but from this

last point (twenty-six feet from the rail), the cars could be seen coming at the distance of some forty to forty-eight rods, and still further when on the track. But at the point in the highway, one hundred and sixty feet south of the crossing, the cars could be seen over the lower wood-piles (the tops of them, and the smoke-stack, at least), for a short distance on the track, extending a space of some thirty-seven rods (from thirty-nine to seventy-six rods west of the crossing), and from the same point a glimpse of them could again be got for only a few rods, at a point nearer the crossing. The plaintiff and Eldridge approached the crossing first along the east and west highway, starting from the corner, at south-west corner of wood-yard (opposite to which is a hotel), and going east four chains and ninety links, and then turning north towards the crossing; this crossing being five chains and eleven links (a little over twenty rods) from the corner going north. From the corner opposite the south-west corner of the wood-yard (at the hotel), cars, when coming from the west, can be seen at intervals from a point directly north on the railroad for a considerable distance west, and again north-east, towards the crossing, for some rods (between wood-piles 1, 2, and 5). And all the way around from the corner at the hotel, thence east four chains ninety links, thence north to near the one hundred and sixty-feet point already mentioned, the tops of the cars, or at least the smoke-stack, can at intervals be seen coming from the west, for a considerable distance; but the view is completely cut off, after reaching the point one hundred and sixty feet from the crossing (from which the view has already been described). Though there was some conflict on the point, there was evidence tending to show, that the wood-piles (especially after getting within one hundred and sixty feet from the crossing) had the effect to deaden the

sound of approaching trains from the west, so that the sound of the cars, and sometimes of the bell, would not be noticed by persons driving along in a wagon or covered carriage, owing partly to the noise made by the wagon or carriage, until the engine was nearly upon the crossing; but by stopping the wagon or carriage, the sound made by the approaching train, as well as by the bell, could be readily heard, and would have been so heard by the plaintiff on this occasion, had the team been stopped at any point between the corner going north and the crossing. And it indisputably appears by incontroverted testimony that, at the very time Eldridge and the plaintiff turned north at the corner (about twenty rods south of the crossing), the approaching train was heard from that corner, while yet half a mile distant, and presently after, from the same point, by persons then there, was seen coming west of the second crossing (which was seventy-six rods west of the crossing where the accident occurred), while the plaintiff and Eldridge were between the point one hundred and sixty feet south and the crossing. Whether the approaching train could have been seen by plaintiff and Eldridge when they were at this point, one hundred and sixty feet south of the crossing, would depend upon the actual rate of speed the cars were running, and the rate also that the team moved from that point to the crossing. But this rate of speed was not so accurately shown by undisputed evidence as to render the point entirely certain; and all that can properly be said of the evidence in this respect is, that it raises a probability that the train might have been seen from this point, had they looked for it when they were there; but this fact might have been found either way, from the evidence. But, upon the evidence, there is no room whatever for any question upon the fact, that, if they had stopped the team at any point between the corner

(twenty rods south) and the crossing, the plaintiff could have heard the approaching train, and the danger would have been avoided.

2. *The plaintiff and Eldridge.*

Both Eldridge and the plaintiff had recently lived in Coldwater. Eldridge had recently removed to a farm south of Branch, and plaintiff was living at his house, and in his employ, at the time. Eldridge was well acquainted with the mode in which trains were run on this road, and knew that extra trains were often run, and that regular trains were frequently behind their time, he having spent much of his time at the Coldwater depot, and generally being there at the arrival and departure of trains. He had within a few days previously, several times crossed at this crossing with his team. He was slightly deaf or hard of hearing; but the plaintiff herself was not.

3. We now come to the transaction itself and the conduct of Eldridge and the plaintiff, in approaching the crossing.

They come up from the south (Eldridge driving the team, with a lumber wagon) to the corner at the hotel, turn down east and go about twenty rods to the corner (at Norton's, who lived at and directly south of it). They are seen by several persons, and, till reaching the corner, they seem to have been going upon a slow trot, and part of the time on a walk. Haybarker, one of plaintiff's witnesses, is walking down the same way, a few rods behind them. Norton stands at his gate looking out into the road, and sees them pass near him; at the same time, and just before they turn north, he hears the train coming, about a half mile off. They turn the corner and go north, towards the crossing, at first starting up a little, but at once relapsing into a walk, which continues all the way. Haybarker follows along, gets to the corner, and sees them again, more

than half way from the corner to the track, and only a few rods from the track, and sees the cars coming just above the second crossing at the same time; he fears they will be caught upon the track. Norton is still looking on, expecting to see them stop (till the train shall pass); but they keep on, still upon the walk, not stopping to listen, and looking neither to the right nor to the left, neither up nor down the track; they are almost upon it; he still thinks they will stop; but they move steadily on; the horses are upon the track; he sees the train strike them, and the wagon fly to pieces. Haybarker, who has been also looking on, has seen the same things. Eldridge and the horses are instantly killed; the plaintiff is found insensible, against the fence on the east, where she is taken up, unconscious. This was the whole transaction, as it appeared to those who were looking on. Comment can add nothing to such a state of facts. No logic can find in it, or extract from it, the faintest manifestation or idea of that reasonable care or common prudence which the circumstances demanded in approaching the crossing. Without necessity, and of their own accord, they move heedless into danger, and meet destruction, equaling in courage, excelling in composure, the immortal six hundred at Balaklava; but in care and circumspection, rivalling only the commander who ordered that "rash and fatal charge."

The testimony of the plaintiff herself, who was sworn as a witness in her own behalf, does not make the transaction materially different, except that it shows the negligence of Eldridge and herself, in some particulars, still more certainly and clearly. Her testimony is substantially this: They were in a lumber wagon; Eldridge was driving, and, just before getting to the corner, the horses were upon a slow trot; they turned the corner to go north, slacked up and went on a walk; when at the corner, the plaintiff remarked

to Eldridge, that it was a dangerous place,—that they could not see the cars either way. [There was no evidence of any obstruction to seeing them at the east.] Eldridge replied that it was a dangerous place,—that there was only one place they could see the cars, and that was by a wood-pile; but he looked at his watch, and said there was no danger, as it was an hour past the time for the train, or that it was past train time. [She states it both ways, and if he said an hour, he was clearly mistaken, as the evidence tends to show that this train was only from fifteen to thirty-five minutes late.] They had no conversation till they got upon the track; they did not stop to listen for the cars, nor does she say they even looked one way or the other to try to see if cars were coming; and her testimony clearly tends to show that they did not; and if any care or diligence was used, the burden was upon her to show it; and what she must have known if it occurred, and fails to prove, must, for this purpose, be taken as not having occurred. They moved upon a walk—[When their seats in the wagon were within twenty-six feet from the south rail they could, if they had looked to the west, have seen up the track for some forty to forty-eight rods, and would then have seen the train, while there was yet time to have stopped and kept out of the way; for the horses' heads must even then have been from eleven to fourteen feet from the track]; but they did not look either way for the cars, till the forefeet of the horses were on the track; when the horses, taking the alarm, raised their heads; and then, according to her own testimony, they first looked; "then," she says, "we looked to the east, and instantly turned our heads to the west, and the cars were instantly against us; and from that time I have no recollection." She also says that, when on the track, and the horses raised their heads, "he went to

25 MICH.—37.

raise his whip, but he first got it in motion when we were struck."

Such is as fair a statement as I have been able to make of all the evidence which can be claimed to have the least tendency to show care or diligence on the part of Eldridge and the plaintiff.    It shows precisely what their conduct was; and, if there is any thing in any part of it, or in the whole of it combined, which has any such tendency, I confess my inability to discover it.    On the contrary, I think the evidence tended affirmatively to prove actual and gross negligence, on their part, which contributed directly to produce the injury complained of.    And I cannot well conceive how the proof of negligence could be stronger, without showing that they saw the cars approaching, and went deliberately and recklessly upon the track, under circumstances which they must have seen would result in disaster. They were both aware, in fact, that there was danger to be apprehended there.    As was properly said by Pollock B. in *Stubley v. London & N. W. R. W. Co. Law Rep., 1 Exch., 13,* "The track itself is a warning of danger to those about to go upon it."    And I think it must be laid down as a principle of law (as it was laid down by the court in a part of his charge), that persons about to cross a railroad track are bound to recognize the danger, and to make use of the sense of hearing as well as of sight—and if either cannot be rendered available, the obligation to use the other is the stronger—to ascertain, before attempting to cross it, whether a train is in dangerous proximity; and if they neglect to do this, but venture blindly upon the track without any effort to ascertain whether a train is approaching, it must be at their own risk.    Such conduct is, of itself, negligence, and should be so pronounced by the courts as matter of law.    In the face of such danger it

seems to me that no lower standard can be recognized of that reasonable care which a prudent man would exercise under such circumstances. This position is amply sustained by the great weight of authority. See *Wilson v. Charlestown, 8 Allen, 138; Butterfield v. Western R. R. Co., 10 Allen, 533; Beisiegel v. N. Y. Central R. R. Co., 40 N. Y., 9; Wilds v. Hudson R. R. R. Co., 24 N. Y., 430; Baxter v. Troy & Boston R. R. Co., 41 N. Y., 502; Grippen v. N. Y. Central R. R. Co., 40 N. Y., 42 to 51; Belfontaine R. R. Co. v. Hunter, 33 Ind., 365; Indianapolis & Cin. R. R. Co. v. Rutherford, 29 Ind., 82; North Penn. R. R. Co. v. Heileman, 49 Penn. St., 60; Stubley v. London & N. W. Railway Co., Law Rep., 1 Exch., 13; Cliff v. Midland Railway Co., Law Rep., 5 Q. B., 258; Galena & Chicago Union R. R. Co. v. Loomis, 13 Ill., 548; Telfer, Admr., v. Northern R. R. Co., 30 N. J., 188.* Many other cases to the like effect might be cited, but these are sufficient to show the general current of authority. Nor does it alter the case that the defendant may have been negligent in not ringing the bell or blowing the whistle, so long as the plaintiff has been guilty of negligence which contributed to the result.—*Butterfield v. Western R. R. Co., ubi supra; Belfontaine R. R. Co. v. Hunter, 33 Ind., ubi supra; Beisiegel v. N. Y. Central R. R. Co., 40 N. Y., 9; Wilcox, Admr., v. Rome, etc., R. R. Co., 39 N. Y., 358; Galena & Chicago Union R. R. Co. v. Loomis, ubi supra; Havens v. Erie Railway Co., 41 N. Y., 296; Baxter v. Troy & Boston R. R. Co., id, 502.* Nor is it any excuse to the plaintiff that he was absent minded, and did not look to see, or stop to hear, the cars. It is a duty which he has no right to neglect, and to claim damages of the company arising, even in part, from that neglect. See *Telfer, Admr., v. Northern R. R. Co., 30 N. J., 188.*

That such failure, under such circumstances, to make use

of any means to ascertain whether a train is approaching, before venturing upon the track, must of itself be pronounced negligence, as matter of law, is a proposition as sound in principle as it is well supported by authority. The laws of nature and of the human mind, at least such of them as are obvious to the common apprehension of mankind, as well as the more obvious dictates of common sense and principles of human action,—which are assumed as truths in any process of reasoning by the mass of sane minds,—constitute a part of the laws of the land, and may, and must, be assumed by the court, without being found by a jury; indeed, the finding of a jury, which should clearly disregard them, should itself be disregarded by the court. In other words, courts are bound judicially to know and apply such laws and principles, as part of the law of the land. They are bound to know, that there is a difference between *reasonable care* and *no care at all,* or utter negligence, and that a prudent man, in the presence of danger, naturally and ordinarily makes some use of his faculties to ascertain and avoid it; and if, upon any occasion, he does not, when he has good reason to apprehend danger, he does not exercise the ordinary or reasonable care demanded by the circumstances. They are, therefore, bound to know, and judicially recognize, the essential differences in the nature and modes of travel and transportation upon railroads, and ordinary highways, both of which are authorized by the law; and, being bound to notice the statutes of the state, they must take notice that greater speed in travel and transportation upon railroads, is one of the objects of the law authorizing this mode of conveyance; and that locomotives and heavy-trains of cars (which are authorized by the legislature) cannot, owing to their momentum when in motion, be suddenly stopped in their course, or turn to the right, or left, like a foot passenger, or a team and wagon upon an

ordinary highway; that the authority given them by law
to cross highways, and fixing no limit to their speed (except
as it may be regulated in cities and villages), necessarily
gives them the preference at the crossings, without which
their speed must be reduced, not only to that of teams and
wagons upon common roads, but much below it, with much
greater danger of collision even at this low rate of speed,
and the impossibility of any thing like system or regularity
in the running of trains; that, like any thing of human
invention, railroads are liable to accidents, and that various
causes may delay trains; that a locomotive coming in con-
tact with a person, or team and wagon, will prove disas-
trous to the latter, if not to the former also; that it is,
therefore, always dangerous for persons or teams to go or
drive upon the track without first ascertaining that no train
is likely to be passing at the same time, and that if the
person so approaching takes no means whatever for this
purpose, does not even look to see, when sight is available,
or when it is not, does not stop to listen, but goes blindly
upon the track, such conduct is, not only not duly careful,
but positively careless; and the court is bound to know, that
such is not the reasonable degree of care which ordinary
men should, or do, use in the face of such danger; and no
verdict of a jury can change this conclusion.    Courts may
not always be able to define precisely all the particulars
which would be necessary to constitute diligence under all
circumstances, and there may even be cases depending upon
a complication of facts and circumstances admitted or found
to be true, in which it would be better to leave the jury
to draw the inference of diligence or negligence than to
undertake to draw it themselves; but even in such cases, it
will be found that some principle of law may be laid down
for the guidance of the jury.    I shall not undertake to lay
down a universal rule applicable to all cases.    It is fre-

quently difficult, perhaps sometimes impossible, to determine how far the question of negligence or reasonable diligence is a question of law, and how far a question of fact. It is generally a question of mixed law and fact; and always, when the facts are found or admitted, if they be such that all reasonable men will be likely to draw from them the same inferences, it is a question of law for the court. But I know of no case in which it can be said with accuracy to be *exclusively a question of fact* for the jury; some principle of law will always be applicable to the particular state of facts, and may be laid down by the court; the principle may sometimes be very general and abstract, but there is still a legal principle involved.

But whatever difficulties there may be in some cases, courts are, at least, bound judicially to know, that *no care* is *not due*, or *reasonable, care*; that when no care whatever has been used in approaching a known or threatened danger, and no effort whatever made to ascertain or avoid it, reasonable care has not been exercised, and the party has been guilty of negligence. There was no difficulty, and the court found none, in correctly determining that certain given states of fact or courses of conduct would constitute negligence or want of ordinary care. This is sufficiently evident from the charges given in answer to the 10th, 11th, 12th, 13th, 14th, 15th, 16th, 18th, 20th, 21st, and 22d requests of the defendant, stating the principles of law applicable to the conduct of parties approaching the track under given circumstances.

Juries may act upon the question of diligence when there is any evidence tending to prove it. If there be no such evidence, there is nothing before them upon which they can find such diligence. And the question of the relevancy of evidence and its tendency to prove diligence, or whether there be any such evidence, is not a question

for the jury, but a question of law for the court; and it must be decided by the court, and not by the jury. If the question of diligence or negligence were *exclusively* one of fact for the jury, without reference to any legal principle applicable to it, then it would necessarily follow, that the jury, and not the court, must determine the relevancy and admissibility of all evidence offered for the purpose of proving the one or the other. This clearly they could not do; the question is one of law; and we are bound to determine, in the present case, whether there was any evidence tending to prove diligence on the part of the plaintiff and Eldridge. I think, as I have endeavored to show, there was no such evidence in the case.

The case of *Detroit & Milwaukee R. R. Co. v. Van Steinburg, 17 Mich., 99,* is relied upon by the defendant in error, as showing that the question of negligence, in the present case, was properly submitted to the jury upon the evidence, and that the evidence was proper to go to the jury upon that point; but in that case there was evidence tending to show that the train which was heard coming by the plaintiff, approached the station *with unusual velocity,* without ringing the bell, and that it reached the point at which he was injured, at the station, much sooner than the plaintiff had any reason, from the previous course of running the cars, to expect; and it was this circumstance only, which was held to give to the testimony a tendency to show diligence on the part of the plaintiff; a point somewhat analogous to that which arose in *Ernst v. Hudson River R. R. Co., 35 N. Y., 9,* and *same case, 39 N. Y., 61,* where the fact that it had long been the practice of the company to keep a flagman at the crossing to warn people of approaching trains, and that no flagman was there at the time of the injury, was held to bear upon the question of diligence, as showing that the plaintiff had a right to

rely upon the customary signal from the flagman. It was expressly conceded in *Detroit & Milwaukee R. R. Co. v. Van Steinburg,* that when no evidence is given by the plaintiff, that he was in the exercise of due care, but on the contrary the whole evidence on which the case rests, shows that he was wanting in due prudence, the court may rightfully (I should say were bound to) instruct the jury, as matter of law, that the action could not be maintained. The present case, I think, comes within this principle; and whether the circumstance which the court held took that case out of the principle, was sufficient for that purpose, I need not inquire, as the present case lacks any such circumstance in favor of the plaintiff.

All the charges given by the court (twenty-one in number), in answer to the requests of the defendant below, are based upon the assumption that, the facts being found, the question of diligence or negligence depending upon those facts, was in this case a question of law. In this, I think, the court was correct, and that all the charges so given, in answer to defendant's requests, were correct in principle. But when the judge came to charge upon the plaintiff's requests, and in his general charge, he went upon the assumption, either that there was evidence in the case tending to show due care on the part of the plaintiff, or that no care on her part was necessary, and that negligence of the defendant contributing to the injury, was sufficient. And he also assumed, and expressly charged, that the burden of proof was not upon the plaintiff to show reasonable care, but upon the defendant to show her negligence, in both of which assumptions I think the court was wrong; and the latter is in direct conflict with several of the charges given on the requests of defendant.

The court, in answer to defendant's requests, charged the jury as follows:

"*First.* According to the admitted fact in this case, the plaintiff was being driven by Eldridge in a lumber wagon, and any neglect on his part has the same effect on the case as if such neglect had been directly by plaintiff herself.

"*Second.* The right of the plaintiff to recover for the injury alleged in the declaration in this case, must depend on concurring facts:

"1. The defendant must be guilty of some degree of negligence which contributed to the injury.

"2. Eldridge, the driver of the wagon in which the plaintiff was riding at the time of the accident, must have been entirely free from any degree of negligence which contributed to the injury.

"3. If there was any negligence on the part both of the defendant and of Eldridge, which contributed in any degree to the accident, the jury have no right to strike a balance between them, so as to find a verdict for the plaintiff, but in such case they must find for the defendant.

"4. Ordinary diligence is the exercise of that care which every person of common prudence bestows upon his own affairs or concerns. And the man of common prudence bestows the highest degree of vigilance and care upon his own affairs when danger to his life environs him, and he apprehends impending disaster. Eldridge was, in this case, bound to use that degree of care; and if by that degree of care on his part the injury might have been avoided, the plaintiff cannot recover in this action.

"5. The question for the jury is not one of comparative negligence, as between the parties, nor does very great negligence on the part of the defendant, if such there was, operate to strike a balance of negligence, so as to give a verdict to the plaintiff, if any negligence of Eldridge contributed in any degree to the injury.

25 MICH.—38.

"6. Where negligence is the issue, it must be a case of unmixed negligence, to justify a recovery; and if both parties, by their negligence, contributed to the injury, neither can recover against the other.

"7. Eldridge could not, by his own negligence, cast upon the defendant the necessity of exercising extraordinary care.

"8. If the negligence of Eldridge, the driver of the team in question, contributed in any degree to the accident complained of, or contributed in any way to the result, the jury are not permitted to measure the degree of contribution, or to inquire whether the negligence of the one was in excess of the other; and in such case the jury must find for the defendant.

"9. If the view of the track was obstructed by the pile of wood and embankment, to the knowledge of Eldridge, and if Eldridge was hard of hearing, common prudence should have dictated to him to approach the track cautiously, and not venture upon it until he had ascertained that no train was approaching. The situation of the woodpile did not diminish the degree of care required of Eldridge, in the slightest degree, but it increased his duty to greater carefulness. He was bound to exercise care, diligence and foresight in proportion to the danger to, be avoided and the fatal consequences involved in neglect.

"10. Every person is bound to know, that a railroad crossing is a dangerous place, and he is guilty of neglect unless he approaches it as if it were dangerous. Eldridge, the driver of the team in question, knew that the crossing where the accident complained of occurred, was a dangerous one; he was bound to know that a train might be approaching; and if he did not look or listen to ascertain whether one was coming, but, on the contrary, drove directly onto the track, and the accident resulted, he was guilty of negligence, and the plaintiff cannot recover in this action.

"11. It is not the exercise of ordinary care and prudence for a person to drive with a team directly onto a railroad crossing, known to him at the time to be dangerous, without making any effort by stopping or listening, or otherwise, to ascertain whether a train is approaching, or whether it is safe to drive onto the railroad with his team.

"12. If a person knows that twelve or more trains are daily passing a dangerous highway crossing of a railroad, that the trains are accustomed to be frequently behind, or off from, their regular time, it is not the exercise of ordinary care or prudence for him to drive with a team and wagon directly onto such crossing, solely in reliance upon the fact, that a certain one of those trains would, according to its regular time, have passed that point fifteen minutes, or thereabouts, before, without using any other means whatever to ascertain whether it was then safe to do so.

"13. If the crossing was rendered dangerous by obstructions to the view, it only made it incumbent on Eldridge, if he knew it to be so obstructed, to take care.

"14. One who, through any want of reasonable prudence, thrusts his vehicle before an approaching train, is in fault, and cannot recover damages for any injury resulting therefrom.    In proportion to the danger will arise the degree of vigilance and caution which a person must use.

"15. All the circumstances, including the piles of wood, testified to by the witnesses, and Eldridge's partial deafness, which made it more than usually difficult for him to see or to hear the approaching train, were, if known to him, so many reasons why he should be the more vigilant and cautious; and instead of forming an excuse for any degree of neglect, imposed on him the duty of greater care and caution; and if he did not for that reason use such greater care, but, on the contrary, drove directly onto the railroad track, without greater care, and the accident and injury

resulted from such want of care contributing in any degree to the accident, the plaintiff cannot recover in this action.

"16. It is not the exercise of proper care for a person acquainted with a railroad crossing to rely on the time for the passing of trains as fixed by the time table, and from that reason [to infer, probably, but some word left out] that there can be no locomotive near, and act without regard to care in crossing; but, if he does so, he acts at his own peril. He will be chargeable with negligence, if, in reliance upon such a reason, he drives onto the track without looking or trying in a proper way to ascertain whether danger is near. And he will not be permitted to recover damages for any injury he may sustain under such circumstances.

"17. In order to be entitled to a verdict in the case, it is necessary, not only that it should have been proved, that the defendant was guilty of negligence contributing to the injury complained of, but also that Eldridge, the driver of the team, was free from any such negligence.

"18. The law requires care at all times in a situation of danger; and mental abstraction or reverie will not excuse its omission. When it is determined, as a legal proposition, that one may not rush blindly upon the rails over which trains are passing, propelled by an agent serving its master almost at its own will, the neglect to use the physical resources, [probably something omitted here] is *negligence* and not mere evidence of negligence.

"19. [This was refused; and, though good law in the case from which it was taken (*Telfer, Adm'r, v. Northern R. R. Co., 30 N. Y.*), where the cars were *in sight* and approaching when plaintiff attempted to cross, the wording of the request was, for this reason, hardly applicable to the present case, and it was not error to refuse it.]

"20. It is the duty of a traveler approaching a railroad crossing, to look along the line of the track, if possible, and see if any train is coming; and if he fail to take such pre-

cautions before the happening of the accident, he is guilty of negligence, and cannot recover from the railroad company for any injury resulting. A traveler approaching a railroad crossing on a public highway is bound to exercise ordinary care, vigilance, and foresight in proportion to the danger to be avoided, and the fatal consequences involved in his neglect. His vigilance should be quickened, not slackened [by the fact, probably], that he could not see the track except at a few points; and if he cannot see the track by reason of any obstruction to the view, then he is called to greater care and watchfulness in driving upon the track than if the view was open. If, in the exercise of such ordinary care and vigilance, he can hear the noise of the coming train, and then drives upon the track, without first fully ascertaining that there is no danger from collision, he is guilty of negligence, and cannot recover against the company for any resulting injury.

"21. One approaching in a wagon on a highway crossing of a railroad, over which passenger trains at a high rate of speed are frequently passing, may reasonably be required to assure himself, if he can by the use of his organs of sight and hearing, that no cars are in dangerous proximity. If necessary to make such observations, he will be required to reduce his rate of speed, or even to stop his conveyance.

"22. Prudent men are sometimes careless. When so, they must accept the consequences of their departure from their usual line of conduct, and the exception is not to mark the amount of care exacted by the law."

Such were the charges given at the request of the defendant; and these charges, when applied to the evidence, effectually put the plaintiff out of court; for there was no evidence in the case tending to show in any degree any of that care or diligence on her part, which the court had, in

these charges, declared to be necessary to enable her to recover; nor a single thing which he had declared would constitute negligence, which that evidence did not clearly show, applied to the conduct of the plaintiff and Eldridge— no evidence to bring their conduct within the court's own definition of ordinary care or prudence, but all, without the least conflict or doubt, which related at all to their conduct, showed the utter impossibility of bringing it within the meaning of that definition,—not a single duty which the court declared devolved upon them in approaching the crossing, which that evidence did not affirmatively show to have been neglected or violated. If, therefore, the charges thus given were right, as in principle I think they clearly were, then, there being no evidence of due care on the part of the plaintiff, but the evidence clearly showing negligence on her part contributing to the injury, the question, whether the defendant also had been guilty of negligence, became utterly immaterial; and all that portion of the charge in answer to the plaintiff's requests, and of the general charge relating to defendant's negligence, and all the theories there stated, upon which the plaintiff would be entitled to recover (which constitute a large portion of the charge), were erroneous; as they necessarily went upon the assumption, either that there was evidence from which they might find that the plaintiff was free from negligence contributing to the injury, or that she might recover, though guilty of such negligence, and that such negligence on the part of the defendant alone, would sustain the action; and these portions of the charge must have been understood by the jury as adopting one or the other of these theories or assumptions, both of which were equally erroneous. These portions of the charge were, therefore, when applied to the evidence, clearly in conflict with those portions given in answer to the defendant's requests.

I have purposly avoided expressing any opinion whether, had the plaintiff been free from negligence, the piling of the wood by the company in such manner as to obscure the view of approaching trains (which, I think, of itself, would not constitute negligence) might, or might not, impose upon the company the duty of greater care or caution in running their trains, or making use of extra means of notifying those about to cross, when trains were approaching; because I think the question is not properly involved in the case, and, as it is a question of the first importance, I am not willing to express any opinion upon it, until a case shall arise in which it is necessarily involved.

I think the judgment should be reversed, with costs, and a new trial awarded.

The other Justices concurred.